RICHARD F. MULVANEY AND SHIRLEY MULVANEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mulvaney v. Comm'r
Docket Nos. 19853-85, 17479-86. United States Tax Court
T.C. Memo 1988-243; 1988 Tax Ct. Memo LEXIS 270; 55 T.C.M. (CCH) 998; T.C.M. (RIA) 88243; May 31, 1988. J. Richard Staley, for the petitioner. Mike E. Jorgenson, for the respondent. PAJAK
PAJAK, Special Trial Judge: Respondent determined deficiencies in, and addition to, petitioners' Federal income tax as follows: Additions to tax under sections [1]
Year
Deficiency
6653(a)(1)
6653(a)(2)
6661
6621(d) [2]
1981
$   512.00
-0-
-0-
-0-
-0-
1982
4,449.00
$ 222.00
*
-0-
***
1983
6,731.00
337.00
**
$ 673.00
****
*275 By Amendment to Answer, respondent increased the additions to tax under section 6661 to $ 1,682.75 and requested that the Court award damages under section 6673 in both of these consolidated cases. After a concession by petitioners of the deficiency for 1981 in docket No. 19853-85, the issues for decision are: (1) whether petitioners are entitled to deductions for contributions allegedly made to the Universal Life Church; (2) whether petitioners are entitled to farm losses deductions; (3) whether petitioners are entitled to an investment credit for 1983; (4) whether petitioners are liable for additions to tax under sections 6653(a)(1), 6653(a)(2), and 6661; (5) whether petitioners are subject to an increased rate of interest under section 6621(c) for substantial underpayments attributable to tax motivated transactions; and (6) whether petitioners are liable for damage to the United States under section 6673. FINDING OF FACT To the extent stipulated, the facts are so found. Petitioners resided in Casselberry, Florida, when their petitions were filed. Petitioners' home was on a two and one half acre lot, and included a barn and an enclosed pasture. During 1982 and 1983, *276 both petitioners were employed by Southern Bell. They reported wage income in the amount of $ 51,788.15 and $ 56,663.43 in 1982 and 1983, respectively. Universal Life Church Bank Account
Petitioners formed a Universal Life Church (ULC) chapter bearing the number 48425. Petitioners prayed daily. They had chapter social meetings with other persons to discuss issues. They did not have a flock or congregation that met regularly. Petitioner Shirley Mulvaney (petitioner) led a girl scout troop, and petitioner Richard Mulvaney coached a youth baseball team. They also took youths on camping trips. Prior to forming the ULC chapter, petitioner was a member of the Trinity Lutheran Church. Neither petitioner nor her husband is an ordained minister. Petitioner did not perform baptisms or weddings for the ULC chapter. Petitioners deposited funds to their ULC chapter bank account (ULC account). Both petitioners were authorized to write checks on the ULC account. Petitioners drew checks on their ULC account to pay their personal expenses from the account, including mortgage payments, insurance, home repairs, carpet, furnishings, electricity, telephone, dentist and doctor bills, *277 lawn mower repairs, fertilizer, a time share condominium, and magazines, etc. Petitioners also paid for car repairs, gasoline, and tires from their ULC account. Petitioners paid a VISA credit card bill from their ULC account. Petitioners also wrote checks for cash. Petitioners claimed, and respondent disallowed, deductions for alleged charitable contributions to the ULC chapter in the amounts of $ 11,214 and $ 12,825 for 1982 and 1983, respectively. One-Horse Breeding Activity
Petitioners' horse breeding activity began in 1982 after discussions with their veterinarian, Dr. J. Donaldson Jones (Jones). While they had owned a riding horse previously, they had no experience in horse breeding. Jones operated a horse breeding business, and in 1982 owned an eleven year old mare named "A Touch of Class" (the mare) who was in foal. The mare's previous foal, by the same stallion, had been a horse show prize winner. After discussing with petitioners the possible financial benefits of breeding this brood mare, Jones sold them the mare for $ 2,500. The mare had about 5 years within which she could be expected to be a good producer of foals. Petitioners housed and fed the mare, *278 dogs, cats, and rabbits on their lot. The mare gave birth to a foal in 1983, but the foal died. Petitioners received approximately $ 3,000 from their insurance company due to the loss of the foal. Petitioners took the mare to Jones to be bred with the same stallion again. Jones received a stud fee of at least $ 1,000. A second foal was born in 1984, and was sold for $ 3,000. Later, the process was repeated and a third foal was born in 1985. That foal is still owned by petitioners. The second foal has been shown once, and the third foal has been shown twice. At the time of trial and third foal was being prepared for another showing. Petitioners sold the mare in 1986. From 1982 through 1986, petitioners had only one mare in their horse breeding activity and sold only one of the mare's three foals. During this time, petitioners' expenditures for their mare and her foals included payments for feed, supplies, labor, veterinarian bills, breeding fees, truck repairs, gasoline, tools, insurance, fertilizer, land clearing, machinery rental, dues, travel, and show fees. Petitioners did not have books of account for their one-horse breeding activity. Petitioner paid all expenses *279 from petitioners' personal checking account. Petitioners reported farm losses on Schedule F, Farm Income and Expenses, in the following amounts: Year
Deduction
1982
$  (3,899.36)
1983
(9,235.72)
1984
* (13,621.92)
1985
** (25,336.03)
Total
$ (52,093.03)
Respondent disallowed the farm losses on the basis that petitioners' horse breeding expenses were not substantiated and that the expenses were not deductible under sections 162 and 212. Investment Tax Credit/Horse
Petitioners were one of a group of investors in a race horse named "Mr. Masterdeck." They paid $ 6,000 for their one-fifth interest in the horse and advanced $ 1,500 for the expenses of racing and maintaining the horse. Petitioners did not take possession of the horse, train and horse or race the horse. The investors shared equally in the profits and losses. Petitioners claimed an investment credit of $ 600 for their investment in the horse on their 1983 return. Respondent *280 determined that petitioner had not established that the property qualified for the credit. Petitioners' Conduct/Section 6673
After the notice of deficiency for 1981 was issued, petitioners made two frivolous motions when they petitioned this Court. Respondent then invited petitioners to attend an appeals conference. Petitioners' so-called tax consultant, Scott Slayback (Slayback), under a power of attorney, responded by sending respondent a proposed meeting schedule. Respondent informed petitioners that Slayback did not meet any of the requirements for representation before the Appeals Division. Petitioners then failed to attend any appeals conference. District Counsel requested twice that petitioners provide information to substantiate their 1981 deductions. Petitioners failed to do so. The IRS then began an audit of petitioners' 1982 and 1983 returns. Petitioners were invited to meet with District Counsel to substantiate the deductions they claimed. Slayback answered the invitation with another letter. Respondent again informed petitioners that Slayback could not represent them because respondent did not recognize the common law power of attorney to Slayback. Petitioners *281 protested that they believed that respondent's nonrecognition of the power of attorney was a denial of their constitutional rights. Respondent then sent to petitioners a report of the examination of their 1982 and 1983 returns. They notified petitioners that if they did not agree with the report they could request an appeals conference. Slayback responded by requesting an appeals conference. Respondent again informed petitioners that respondent would not recognize Slayback. Petitioners responded by having Slayback request an appeals hearing and again respondent advised petitioners that Slayback could not represent them before the appeals division. Petitioners sent a formal protest but did not attend the appeals conference or provide information. After a notice of deficiency was issued for 1982 and 1983, petitioners again made the same two frivolous motions when they filed their petition. The Appeals Division again invited petitioners to produce records regarding the issues in this case so that any disputes could be resolved without a trial. Petitioners failed to respond. Petitioners first produced documents to substantiate their deductions at 5:15 p.m. on a Friday less than *282 three days before the trial. OPINION Universal Life Church Bank Account
It is well established that deductions are a matter of legislative grace, and that taxpayers must satisfy the specific statutory requirements for the deductions they claim. Davis v. Commissioner,81 T.C. 806, 815 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985). Taxpayers bear the burden of proving their entitlement to the deductions they claim. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).
A charitable contribution or gift is allowed as a deduction under section 170 if it is made to an entity organized and operated exclusively for religious or charitable purposes, provided that none of the net earnings of the organization inure to the benefit of a private individual. [3] Petitioners have failed to meet the tests of section 170(c)(2). *283 First, petitioners' dominion and control over their ULC account precludes a finding that there have been any charitable contributions by petitioners. The term "charitable contribution" as it is used generally in section 170 is largely synonymous with the term "gift." A gift is generally defined as a voluntary transfer of property to another without consideration. Petitioners' retained control and personal benefit preclude a finding of a gift in this case. Davis v. Commissioner,81 T.C. at 817. Second, the only documents in the record are the checks from petitioners' ULC account. [4] There is no documentary or other evidence regarding the organization of their ULC chapter or of the distribution of its assets upon dissolution. The failure to provide any such documentation or other evidence means petitioners have failed to prove that their "church" was "organized and operated exclusively for religious * * * purposes." Section 170(c)(2)(B); Davis v. Commissioner,81 T.C. at 817; Calvin K. of Oakknoll v. Commissioner,69 T.C. 770, 773 (1978), affd. without published opinion 603 F.2d 211 (2d Cir. 1979); see section 1.501(c)(3)-1(b), Income Tax Regs. *284 Moreover, petitioner admitted that they had no congregation for their mail-order ministry and made no claim that either petitioner was an ordained minister. Thirdly, the record overwhelmingly establishes that the deposits to their ULC account inured to petitioners' benefit. Section 170(c)(2)(C); Miedaner v. Commissioner,81 T.C. 272 (1983); McGahen v. Commissioner,76 T.C. 468, 482-483 (1981), affd. without published opinion 720 F.2d 664 (3d Cir. 1983). The record shows the pervasive use by petitioners of their ULC account for petitioners' personal and family expenses. Petitioners stipulated that their ULC chapter paid for their living expenses and for numerous business expenses. Petitioners' assertion that they were entitled to a parsonage *285 allowance because they paid their personal and housing expenses from their own funds deposited into their ULC account is specious. Section 107 provides in pertinent part that in the case of "a minister of the gospel, gross income does not include * * * the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home." Petitioners received no compensation from a religious organization and are not entitled to exclude compensation from other sources under section 107. The Eleventh Circuit, to which an appeal would lie, has imposed double costs in favor of respondent and against the taxpayers in another ULC case. We find apposite the statement of the Eleventh Circuit: We note that other taxpayers have attempted to avoid payment of taxes through claimed contributions to the Universal Life Church and in those cases have attempted the same tactics as the taxpayers here. If there are similar frivolous appeals of other cases, as frivolous as this, we would be inclined to assess attorney's fees in addition to doubling the costs. [Harrison v. Commissioner,805 F. 2d 973, 974 (9186), *286 affg. per curiam an unreported opinion of this court. [5]] One-Horse Breeding Activity
We turn to respondent's determination that the horse breeding losses are not deductible because petitioners were not engaged in an activity for profit. We agree. An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." If the activity is not engaged in for profit, then section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit objective, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1). Petitioners must show *287 that they engaged in their horse breeding activity with the "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 644-646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is not required, petitioners' actual and honest objective of making a profit must be bona fide. Fuchs v. Commissioner,83 T.C. 79, 98 (1984). However, "a record of continued losses over a series of years or the unlikelihood of achieving a profitable operation may be an important factor bearing on the taxpayer's true intentions." Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2nd Cir. 1967). Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. [6]
*288 The issue is on of fact to be resolved not on the basis of any one factor, but on the basis of all the facts and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979); Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). Greater weight is given to objective facts than to the parties' mere statement of their intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). In the case at hand, petitioners failed to carry on their horse breeding activity in a business-like manner. Petitioners failed to maintain books of account or records showing expenses or income from the horse breeding activity. If petitioners had actually intended to make a profit, instead of owning a horse for pleasure, they would have kept sufficient records to be able to evaluate the situation. If they had done so, they would have realized the impossibility of making a profit with one mare and at a one-foal-a-year production level before incurring expenses of $ 52,093.03 over four years. Section 1.183-2(b)(1), Income Tax Regs.
Petitioners failed to obtain *289 the expertise necessary for methodically and scientifically developing their so-called activity. Section 1.183-2(b)(2), Income Tax Regs. Petitioners had no experience in horse breeding. They did not study the business, economic, or scientific practices of horse breeding. They never attended any seminar of course in horse breeding, or subscribed to any magazines concerning horse breeding or sales. The only evidence of consultation by petitioners was that Jones told them that they could make money with the brood mare. It seems that it was Jones who made the money by selling the brood mare to petitioners since they paid him a stud fee of at least $ 1,000 for each use of his stallion. The time and effort expended by the taxpayer in carrying on the activity is also a factor. Section 1.183-2(b)(3), Income Tax Regs. Petitioners did not leave their jobs with Southern Bell to engage in the horse breeding activity. Given the losses they claimed and the lack of business records, if they actually had a profit objective, they would have invested more time and effort in making the activity profitable. Both petitioners were employed full *290 time by Southern Bell during the years at issue. On most of their returns, they showed their occupations as "public service" and "material service." They did not claim that they were horse breeders on their returns but merely deducted farm losses on the farm income and expense schedule. In both 1982 and 1983, their combined wages or salaries from their occupations exceeded $ 50,000. They offset their wages and salaried income with the losses from the one-horse breeding activity. While their income was not unduly large, it was sufficient to show they could afford a hobby horse. Due to the long gestation time and the years of growth necessary before a foal can grow to reproduce itself and increase the herd, new horse breeding ventures may take many years before they become profitable. The occasional income petitioners had through boarding, a single sale of a foal, and the insurance money was insufficient to show a profit motive at any time. On this record, we hold that petitioners did not have an actual and honest profit objective in conducting their one-horse breeding activity. Petitioners are not entitled to claim deductions for farm losses. Investment Tax Credit/Horse
*291 Respondent disallowed petitioners' claimed investment tax credit of $ 600 for 1983 due to their investment on "Mr. Masterdeck" because it was determined that petitioners had failed to establish that the horse was property qualified for the credit. Section 38 provides for a credit against tax for investment in certain property. Section 48(a)(6) defines "section 38 property" to include "livestock (other than horses)." Section 48(a)(6) further states that "Horses shall not be treated as section 38 property." Petitioners' claimed investment credit is in direct conflict with the statutory provisions and is denied. Section 6653
Respondent determined that petitioners are liable for additions to tax under sections 6653(a)(1) and 6653(a)(2). Petitioners bear the burden of proving that the underpayments were not due to negligence or intentional disregard of the rules and regulations. Burwell v. Commissioner,89 T.C. 580, 594 (1987). This Court has repeatedly sustained section 6653 additions in cases involving purported charitable contributions to a ULC which simply represented use of the taxpayers' funds for personal and family expenses.m. Burwell v. Commissioner,89 T.C. at 594; *292 Davis v. Commissioner,81 T.C. at 820-821. Petitioners deliberately engaged in ULC activities designed to understate their tax liability by claiming contribution deductions which were without substance in law or in fact. Petitioners also claimed an investment credit which was patently unavailable. If any part of the underpayment is due to negligence or intentional disregard of rules or regulations, the addition to tax under section 6653(a)(1) is imposed on the entire underpayment. The addition to tax under section 6653(a)(2) is imposed on the portion of the underpayment which is due to negligence or intentional disregard of rules and regulation. In this case, we find that the entire underpayment in each applicable year was due to negligence and/or intentional disregard of rules and regulations. Accordingly, petitioners are liable for the additions to tax undersection 6653. Section 6661
Respondent determined that petitioners are liable for an addition to tax under section 6661(a) of $ 1,682.75 for 1983. Section 6661 imposes an addition to tax in an amount equal to *293 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner,90 T.C. 498 (1988). In that case, this Court held that the 25-percent addition enacted by the Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat. 1874, applies instead of the 20-percent addition enacted by the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085. An understatement is "substantial" when it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. Section 6661(b)(1). "Understatement" is defined in pertinent part as the excess of the amount of tax required to be shown on a return over the amount of tax actually shown on a return. Section 6661(b)(2). Petitioners stated on their return that their tax liability for 1983 was $ 1,669. Since we have sustained respondent's determinations,the actual tax liability is $ 8,400.00, leaving an understatement of $ 6,731. This amount exceeds $ 5,000 and is also greater than 10 percent of the tax required to be shown on the return. Under section 6661(b)(2)(B), an understatement may be reduced if the taxpayer shows *294 that there was substantial authority for the taxpayer's treatment of the item, or that the relevant facts affecting the tax treatment of the item are adequately disclosed in the return. Petitioners have not made an attempt to show that there was substantial authority for their position regarding any issue in 1983. Based on our examination of petitioners' 1983 return, we conclude that they did not adequately disclose in their return the facts affecting the tax treatment of the items at issue. Petitioners are liable for the addition to tax under section 6661(a) for 1983. Section 6621(c)
Respondent also determined that petitioners are liable for the increased rate of interest imposed by section 6621(c). Section 6621(c) provides for an increase in the rate of interest accruing after December 31, 1984, to 120 percent of the otherwise applicable rate with respect to a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." [7] The addition applies to interest which accrues after December 31, 1984, regardless *295 of the filing date of the returns. Solowiejczyk v. Commissioner,85 T.C. 552(1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). This Court has jurisdiction to determine the portion of the deficiency which is a substantial underpayment attributable to a tax motivated transaction. Section 6621(c)(4). Under regulations issued by the Secretary of the Treasury pursuant to the express *296 authority of section 6621(c)(3)(B), the definition of tax-motivated transaction includes any deduction disallowed for any period undersection 183 relating to an activity engaged in by an individual that is not engaged in for profit. Section 301.6621-2T, Q and A-4, Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 59394 (Dec. 28, 1984). Since we have denied the deductions petitioners claimed for their one-horse breeding activity as an activity not engaged in for profit, that activity was a tax motivated transaction, and the section 6621(c) increased rate of interest applies to those transactions in 1982 and 1983. Since 6621(c)(3)(A)(v) provides that a tax motivated transaction includes "any sham or fraudulent transaction." Petitioners purportedly made charitable contributions to a fictional church while retaining control over the funds. They then paid their personal expenses out of the ULC account. Petitioners attempted to avoid paying taxes by claiming deductions for the contributions, thereby depriving the United States of its tax revenue. Section 6621(c) requires the imposition of the increased rate of interest because their activity in connection with their *297 ULC chapter and related bank account was a "sham or fraudulent transaction." Although respondent determined that the entire underpayment of tax for 1983 was a substantial underpayment attributable to tax motivated transactions, he has overlooked the grounds for the disallowance of the investment tax credit. This disallowance is based on the plain language of section 48(a)(6). This provision is not encompassed by section 6621(c)(3) and section 301.6621-2T, Proced. & Admin. Regs. (Temporary). Accordingly, petitioners' claim of an investment tax credit was not attributable to a tax motivated transaction. The actual underpayment attributable to the tax motivated transactions in 1983 will have to be determined in the Rule 155 computation. We note that since section 6621(c)(2) requires that the underpayment of tax be greater than $ 1,000 for 1 or more tax motivated transactions, the underpayment is calculated on the basis of the sum of all such transactions. Therefore the increased rate of interest will be assessed for both the one-horse breeding activity and the ULC deductions for each of the years in issue, even if the underpayment attributable to one or both of these items *298 in a year is $ 1,000 or less, as long as the total underpayment for that year exceeds $ 1,000. See section 301.6621-2T, Q and A-5, Proced. & Admin. Regs. Section 6673
Congress has granted this Court the authority to award the United States damage of up to $ 5,000 whenever it appears to this Court that the proceedings before it have been instituted or maintained by the taxpayer primarily for delay or that the taxpayer's position in such proceedings was frivolous or groundless. Section 6673. This Court has held numerous times that a taxpayer's liability for tax cannot be escaped by establishing a ULC chapter and then paying personal expenses from the chapter funds. Burwell v. Commissioner,89 T.C. 580 (1987); Davis v. Commissioner,81 T.C. 806 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985). Respondent informed petitioners about the section 6673 provisions and about the fact that the courts repeatedly have found actions based on ULC contributions to be without merit. Petitioners nevertheless maintained this action. Although petitioners' position on their one-horse breeding activity had little chance *299 of success, it was a question of fact. Nevertheless, petitioners maintained their position as to the ULC contributions despite overwhelming authority to the contrary. Petitioners should not be permitted to waste the Court's time and resources by bringing frivolous and groundless positions before the Court and escape liability under section 6673 merely because they have another issue to be decided. See Rager v. Commissioner,T.C. Memo. 1984-563, affd. 775 F.2d 1081 (9th Cir. 1985). [8] In Rager, section 6673 damages were awarded in a case where the taxpayer asserted a frivolous ULC argument and an unrelated argument. To the same effect, see Ruberto v. Commissioner,T.C. Memo. 1987-623. Petitioners' waste of the Court's time and resources on a case based on grounds previously determined *300 and their failure to cooperate in the preparation for trial is a disservice to honest taxpayers with legitimate issues to be determined. We find that the proceedings in this case were instituted and maintained primarily for delay and that petitioners' principal positions in this proceeding are frivolous and groundless. Damages will be awarded to the United States in the amount of $ 5,000 in docket No. 17479-86. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the taxable years in question, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Former section 6621(d) was redesignated as section 6621(c)↩ pursuant to section 1511(c), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. We will use the reference to the Internal Revenue Code as redesignated and amended. *. 50 percent of the interest due on the $ 4,449.00 underpayment due to negligence. ↩
***. on the entire underpayment of tax. ↩
**. 50 percent of the interest due onthe $ 6,731.00 underpayment due to negligence. ↩
****. on the entire underpayment of tax. ↩
*. Petitioners reported $ (14,821.92) in farm losses, less $ 1,200.00 in boarding income. ↩
**. Petitioners reported $ (26,336.09) in farm losses, less $ 1,000.06 in other income from a fuel credit. ↩
3. Section 170(c) provides in pertinent part as follows: SEC. 170(c). CHARITABLE CONTRIBUTION DEFINED. -- For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of - * * * (2) A corporation, trust, or community chest, fund, or foundation -- (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States; (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), of for the prevention of cruelty to children or animals; (C) no part of the net earnins of which inures to the benefit of any private shareholder or individual; * * * ↩
4. At trial we refused to admit two alleged receipts from ULC Modesto because of their hearsay character. Harrison v. Commissioner,805 F.2d 973, 974 (11th Cir. 1986), affg. per curiam an unreported opinion of this Court. Appeal in this case would lie to the Eleventh Circuit Court of Appeals. See also Mustain v. Commissioner,T.C. Memo. 1982-670↩. 5. This unreported opinion was a Bench Opinion rendered by this Court on March 3, 1986. ↩
6. These factors include: (1) the manner in which taxpayer carried on the activity; (2) the expertise of taxpayer or his advisors; (3) the time and effort expended by taxpayer in carrying on the activity; (4) taxpayer's expectation that assets used in the activity may appreciate in value; (5) taxpayer's success in other similar or dissimilar activities; (6) taxpayer's profit and loss history with respect to the activity; (7) presence and amount of occasional profit (8) taxpayer's financial status; and (9) whether personal pleasure or recreation are associated with the activity. ↩
7. SEC. 6621(c). INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS -- * * * (3) TAX MOTIVATED TRANSACTIONS. -- (A) IN GENERAL. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 45(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction. ↩
8. In addition to sustaining this Court's award of damage under section 6673, the Ninth Circuit imposed double costs and $ 1,000 attorneys fees for which the taxpayers and their counsel were jointly and severally liable. Rager v. Commissioner,775 F.2d 1081, 1083-1084↩ (9th Cir. 1985), affg. a Memorandum Opinion of this Court.